# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **CORNELIUS BELL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.:  2:11-CV-3732-RDP |
| } | |
| **JEFFERY NORWOOD, et al.** } | |
| } | |
| **Defendants.** } | |

### MEMORANDUM OPINION

Pending before the court is Defendants Jeffery Norwood's ("Officer Norwood" or "Norwood"), and Tim Cater's ("Officer Cater" or "Cater") Motion for Summary Judgment filed on October 17, 2013. (Doc. #37). On November 7, 2013, Plaintiff Cornelius Bell filed his opposition to summary judgment. (Docs. #39). Defendants replied on November 19, 2013. (Doc. #40). After careful review, the court concludes the motion is due to be granted.

### I.  BACKGROUND

Plaintiff has asserted various claims against Defendants Norwood and Cater, two Birmingham City Police Officers,[1] related to his arrests in May and July 2010 for allegedly failing to register as a convicted sex offender. (Doc. #1 at ¶ 8). Plaintiff's underlying conviction from 1998 was for indecent exposure. (Doc. #1 at ¶ 9; 38 at p. 3 ¶ 4). However, during the relevant time frame, a conviction for indecent exposure would not subject a criminal defendant to registration under the Alabama Community Notification Act. To trigger application of the Act, a person must have been convicted of a criminal sexual offense listed in Alabama Code § 15-20-

---

[1] Doc. #1 at ¶¶ 4, 5.

21(4), and indecent exposure is not listed as a criminal sexual offense in that statutory provision. It follows (and it is not disputed by any party) that Plaintiff's conviction for indecent exposure does not warrant application of the Alabama Community Notification Act.[2]

## II. FACTS[3]

For the most part, the facts of this case are not genuinely disputed. On March 25, 1998, Bell was convicted of indecent exposure in Birmingham Municipal Court, Case Number 00680755; accordingly, he is convicted as a sex offender. (Doc. #38 at p. 3 ¶ 4). When Bell entered a guilty plea to the charge of indecent exposure in 1998, no one told him that he had to register as a sex offender. (Doc. #39 at p. 7 ¶ 1). Nevertheless, ten years later, Bell was arrested in September 2008 for failing to register. (*Id*. at ¶ 2). But that charge was later dismissed for lack of probable cause. (Doc. #39 at p. 7 ¶ 2).

During the relevant time period, Alabama law imposed some registration requirements on persons convicted of indecent exposure. In particular, Alabama law required that:

---

[2] The Alabama Legislature in Act No. 2011-640, Ala. Acts 2011, repealed the Community Notification Act and replaced it with the Alabama Sex Offender Registration and Community Notification Act, effective July 1, 2011. *See* § 15-20A-1 et seq., ALA. CODE 1975; *Acra v. State*, 105 So.3d 460, 463 n.1 (Ala. Crim. App. 2012). However, that law was not applicable during the relevant time frame (*i.e.*, on the two occasions when Plaintiff was arrested that are at issue in this case — May 27, 2010 and July 15, 2010).

[3] The court views the facts in the light most favorable to Plaintiff, the non-movant. The court has reviewed the evidence, and all factual inferences arising from it, in the light most favorable to the nonmoving party. Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'" (citation omitted). Thus, the court recognizes that the facts that may be presented if this case were to proceed to trial may be different than the facts presented on summary judgment; however, the court must take Plaintiff's plausible versions of the facts as true at this stage. If the facts are in dispute, they are stated in a manner most favor to the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993).

2

> any person, ... residing in Alabama, [who] has heretofore been convicted, ... shall, upon his or her release from legal custody, register with the sheriff of the county of his or her legal residence within seven days following such release[.] Any person having been so convicted shall upon moving his legal residence from one county to another register with the sheriff of the county to which he has moved within seven days after such removal.

ALA. CODE 1975 § 13A-11-200(b)-(c). Thus, Bell had no obligation to register any other address with the local sheriff unless he moved out of Jefferson County. And there is no allegation in this case that Plaintiff moved from Jefferson County after his initial registration or even after his re-registration in 2008. (Doc. #39 at p. 10 ¶ 34; Doc. #40 at p. 5).

After his September 2008 arrest, Bell registered as a sex offender with the Jefferson County Sheriff's Office on October 7, 2008. (Doc. #39 at p. 7 ¶ 3). At that time, he notified the sheriff that he was residing at 110 Redstone Way, Birmingham, Alabama 35215. (*Id.*). Therefore, by all indications in the record, Bell was in full compliance with Alabama law.

In 2010, Norwood and Cater were serving as members of a collaborative effort of a multi-jurisdictional task force involving the United States Marshals Service Gulf Coast Regional Fugitive Task Force. (Doc. #37-5 at p. 5; 37-7 at p. 5). This task force effort, known as "Operation Clean Slate," was comprised of members of the United States Marshals Service, the Jefferson County Sheriff's Office, and the Birmingham Police Department. (Doc. #37-5 at p. 5). The purpose of the operation was to verify the current residence of convicted sex offenders in Jefferson County, Alabama. (Doc. #37-7 at p. 5). Each day, as part of their duties, members of the task force were given files by their supervisors on registered sex offenders and were directed to verify that the sex offender still resided at the address they had registered as their residence. (*Id.*).

On April 29, 2010, Norwood and Cater were given a file on Plaintiff Bell, and tasked with verifying that he still lived at 110 Redstone Way in Birmingham, Alabama (the address Bell had given as his residence when in 2008 he registered with Jefferson County as a sex offender). (Doc. #39 at p. 7 ¶ 3). Neither Norwood nor Cater had previously performed any sex offender address verifications before. (Doc. #39 at p. 7 ¶ 9). They had attended a single training session conducted jointly by the United States Marshals Service, Jefferson County Sheriff's Office, and the Birmingham Police Department. (*Id.* at ¶ 10). While there, the officers received some limited direction, but that instruction did not address what types of notification were required of different types of sex offenders (*e.g.*, a criminal defendant convicted of rape as compared to one convicted of indecent exposure). (*Id.* at p. 6 ¶ 19).

It does appear that the relevant Alabama Code materials were available at the session, but were not referenced as part of the training. (Doc. #39-4 at 19:1-19). Although Plaintiff does not dispute that Norwood and Cater were never instructed on the distinction between the reporting requirements of adult sex offenders' underlying convictions, Plaintiff alleges that the Defendants should have known that Bell's underlying sex offense did not impose a duty on him to notify the local sheriff's department of his address changes within the county limits because "the learning materials on the sex offender law were made available to them." (Doc. #39 at p. 6 ¶ 3). Again, the record reflects that the "Learning Materials" referenced were actually the Alabama Code. In any event, in a different context, the Supreme Court in *Connick v. Thompson* noted that "legal training is what differentiates attorneys from average public employees" and "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles" 131 S. Ct. 1350, 1361, 1363-64 (2011) (observing that an "injury or accident could have been avoided if

4

an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice.") (internal quotation marks omitted).[5]

Norwood and Cater were provided Bell's file and then went to the residence, but it appeared to be vacant. (Doc. #38 at p. 4 ¶¶ 8-9). Norwood spoke with several neighbors who stated it had been about a year since they had seen anyone living at the home. (*Id*. at ¶ 9). Norwood then posted a notice on the front door, "Urgent Sex Offender Verification Attempt." (*Id.* at ¶ 10). The notice provided Norwood's name and phone number, and informed Bell to contact Norwood immediately. (*Id*.). No one responded to the notice. (*Id*.). When Norwood checked the residence again, he found the notice was still in place. (*Id*.).

After investigation, if a task force officer was unable to verify that the sex offender resided at the address they were registered, that officer was to prepare an Incident/Offense Report and provide the District Attorney ("DA") with all of the documentation that had been gathered. (Doc. #38 at pp. 4-5 ¶ 11). The record indicates that this was the only information presented to the DA in advance of the DA's review. (Doc. #37-6 at p. 64:6-11). In turn, the DA would determine whether probable cause existed to request a warrant. (*Id*. at 63:10-14). After Norwood completed an affidavit and submitted his report to the DA, an arrest warrant was issued. (Doc. #38 at p. 5 ¶ 12).

---

[5] Here, Bell does not assert a "failure-to-train" claim under 42 U.S.C. § 1983 in which a municipality could be held liable for the inadequate training of its law enforcement officials and the training materials would become pertinent to the Defendants' allegedly unlawful conduct with respect to false arrest and malicious prosecution claims. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694-95 (1978) (finding that § 1983 holds municipalities liable when governmental policies and practices cause public employees to violate an individual's constitutional rights); *see also Giannetti v. City of Stillwater*, 216 F. App'x. 756, 766 (10th Cir. 2007) (finding that a police officer's violation of a city police department's training materials was insufficient to deprive the officer of qualified immunity because "evidence of the violation [was] therefore irrelevant." quoting *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-64 (10th Cir. 2005)).

Bell was arrested on May 27, 2010 for failing to register as a sex offender. (Doc. #18 at ¶ 13). On or about June 1, 2010, Bell was released on bond and registered with the Jefferson County Sex Offender Unit. (*Id*. at ¶ 15). In his registration, he stated that he resided at 2813 23rd Street, Birmingham, Alabama 35208, an address in Jefferson County.  (*Id*.).

On June 25, 2010, Cater went to the 23rd Street address to verify that it was Bell's residence. (Doc. #38 at p. 5 ¶ 14). Upon his arrival, Cater spoke with Mary Clayton and was told that (1) Bell did not live there, and (2) that he had not been there for over a week and a half. (*Id*.).  To the contrary, Bell contends he actually still lived at the 23rd Street address, but was not home at the time.  (Doc. # 39 at p. 8 ¶ 17).  At that point the officers had no valid address for Bell. (Doc. #38 at p. 5 ¶ 14). Norwood and Cater had attempted to verify Bell's actual residence on two occasions (and at two different addresses). (*Id.* at ¶¶ 10, 14). Each time it appeared Bell no longer resided at the particular residence. (*Id.*).

Cater prepared an Incident/Offense Report and submitted the file to the DA.  (*Id*. at ¶ 15). The DA reviewed the file (which consisted of Cater's report and affidavit) and approved an arrest warrant.  (*Id*. at p. 6 ¶ 16).

On July 15, 2010, police came to Bell's new residence at 583 41st Street North, Birmingham, Alabama 35222, and arrested him (again) for failing to register as a sex offender.[6] (Doc. #37-1 at p. 6, ¶ 18; 18 at ¶ 20).  Bell spent five days in jail and was released on July 20, 2010. (Doc. #18 at ¶ 28). On August 5, 2010, three police officers attempted to arrest Bell yet again for the same charge, but failed to do so when Bell showed them his registration card. (Doc.

---

[6] Norwood was not involved in any of the actual arrests of Bell. (Doc. #16-2 at p. 2). Cater arrested Bell on or about July 15, 2010. (Doc. # 16 at p. 6 ¶ 18).

#16 at p. 6 ¶ 22). The criminal charges filed against Bell were dismissed on July 20, 2010, and August 12, 2010, respectively. (Doc. #18 at ¶ 29).

There is no dispute that at all times while serving on the task force Norwood and Cater were acting within scope of their discretionary authority as state officials. (Doc. #38 at p. 7 ¶ 20). Also, when Norwood and Cater filed affidavits for warrants for Bell's arrest, they claim they were following task force procedures based on the information and knowledge they possessed at that time. (Doc. #38 at p. 7 ¶ 21). Norwood and Cater believed that they had probable cause to have warrants issued for Bell's arrest. (*Id.*).

### III.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## IV.  DISCUSSION

### A.  Because He was Arrested Pursuant to Warrants, Plaintiff Cannot Assert a False Arrest Claim.

When an arrest challenged by a civil rights plaintiff has been made pursuant to a warrant, the only available claim under § 1983 is malicious prosecution. *See* 42 U.S.C. § 1983; *see also Carter v. Gore*, No. 13-11629, 2014 WL 783151, *1, *2 (11th Cir. Feb. 28, 2014). In *Carter*, the Eleventh Circuit explained:

> Given that Carter was arrested pursuant to a warrant, the district court properly concluded that Carter's only available claim against Gore under § 1983 was for malicious prosecution. In *Heck v. Humphrey*, the Supreme Court distinguished false arrest from malicious prosecution, stating, 'unlike the related cause of action for false arrest or imprisonment, [malicious prosecution] permits damages for confinement imposed pursuant to legal process.' 512 U.S. 477, 484, 114 S. Ct. 2364, 2371, 129 L.Ed.2d 383 (1994).  The issuance of a warrant—even an invalid one (as Bell alleges was issued here)—constitutes legal process; therefore, where an individual has been arrested pursuant to a warrant, his claim is for malicious prosecution rather than false arrest. *See Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995) (holding adopted by the Eleventh Circuit in *Whiting v. Traylor*, 85 F.3d 581, 585 (11th Cir. 1996)); *see also Joyce v. Adams*, 2007 WL 2781196, at *4 (S.D.Ga. Sept. 20, 2007) ('*Regardless of the validity of the warrant*, plaintiff's allegations support a § 1983 malicious prosecution claim rather than a § 1983 false arrest claim.' (emphasis added)). In such circumstances, the Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003); *see also Joyce*, 2007 WL 2781196, at *4 (recognizing malicious prosecution as a cognizable § 1983 claim).

8

*Id.* It follows that Bell cannot assert a false arrest claim. *See id.* Rather, his only available claim under § 1983 is one for malicious prosecution. *See id.*

### B.   The Qualified Immunity Doctrine

Qualified immunity offers complete protection for a government official -- provided that the official was performing discretionary functions and has been sued in his individual capacity -- if the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has held that the doctrine of "[q]ualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects public officials from broad-ranging discovery disruptive to effective government, *id*. at 818, and operates as a shield against civil damages due to mistaken judgments. *Malley v. Briggs*, 475 U.S. 335, 343 (1986); *see also Butz v. Economou*, 438 U.S. 478, 507 (1978) ("[Public] officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law."). The qualified immunity entitlement will fail only "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)) (emphasis removed). Qualified immunity "represents the norm" for government officials exercising discretionary authority. *Id.* at 807. Indeed, as the qualified immunity defense has evolved, it provides ample protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

Qualified immunity is "an immunity from suit rather than a mere defense to liability…." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted). Indeed, the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987). Accordingly, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

The qualified immunity analysis utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless h[is] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). "We generally accord . . . official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991). Defendants retain their entitlement to qualified immunity if a reasonable police officer, in light of the information known to them along with pre-existing law, could have believed his conduct lawful. *See Creighton*, 483 U.S. at 641. The outcome of an assertion of qualified immunity depends in large measure on whether (1) the law allegedly violated was clearly established at the time of the conduct complained about, and (2) if it was, whether the official's conduct was objectively reasonable in light of the information known to the official at the time. *Id.* at 641. These are both objective and fact-specific inquiries. *Id.* And while the court addresses them as questions of law, *Mitchell*, 472 U.S. at 526-28 & n.9, it does so by viewing the record through the eyes of an objective, reasonable governmental official. *Nicholson v. Georgia Dep't of Human Res.*, 918 F.2d 145, 147 (11th Cir. 1990). To determine whether an officer's actions were objectively

reasonable, the court looks at the information known to him, viewed in a light most favorable to the plaintiff. *Swint v. City of Wadley*, 5 F.3d 1435, 1438 (11th Cir. 1993), *modified on reh'g on others grounds*, 11 F.3d 1030 (11th Cir. 1994).

Under qualified immunity, an officer is protected from suit when he makes a reasonable mistake of law or fact. *See Pearson*, 555 U.S. at 231. *See also Messerschmidt v. Millender*, ____ U.S. ____, 132 S. Ct. 1235, 1244 (2012) ("[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks and citations omitted).  If an officer's error is entitled to the protection of qualified immunity, such protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (internal quotation marks and citations omitted). Indeed, as the Eleventh Circuit has recently stated, "the salient question . . . is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Under the qualified immunity doctrine, government officials performing discretionary functions are immune from suit unless the alleged conduct violates "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.[7] "Qualified immunity operates to ensure that before they are subjected to suit,

---

[7] "Clearly established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Creighton*, 483 U.S. at 640. Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

officers are on notice their conduct is unlawful." *Hope*, 536 U.S. at 739 (internal quotations and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Pelzer*, 536 U.S. at 739 (internal quotations and citations omitted).

Once a defendant has raised the defense of qualified immunity and has shown that his actions were within the scope of discretionary authority, then the plaintiff has the burden to overcome the defense. *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). More specifically, the Eleventh Circuit recognizes the following two-part analysis for qualified immunity claims:

> 1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Id.* (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)) (other citations omitted). Furthermore, there is a temporal requirement related to this inquiry — a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established *at the time* of the purported violation. *Creighton*, 483 U.S. at 641; *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

### C.  Application of the Qualified Immunity Doctrine Here

#### 1.  Norwood and Cater Were Exercising Their Discretionary Authority.

As a threshold matter, a government official first must show that he acted within his discretionary authority; in other words, that "objective circumstances [exist] which would

compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich*, 841 F.2d at 1564. At this stage of the analysis, the court should ask whether the government employee was (a) performing a legitimate job-related function, (b) through means that were within his power to utilize. *Holloman*, 370 F.3d at 1265.

In determining whether this test is met, there is no analysis of whether the official actually acted lawfully. *See Sims v. Metro. Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992). Rather, the issue is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the governmental officer's] discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). As such, "[i]t is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority." *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998).

Without question, Norwood and Cater were acting within the scope of their discretionary authority when they supplied affidavits and other submissions to the Jefferson County DA, and Cater was acting within the scope of that authority when he arrested Plaintiff. "A government official proves that he acted within the purview of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims*, 972 F.2d at 1236 (internal citations and quotation marks omitted). Looking objectively at the circumstances described in the complaint, it is readily apparent that the actions taken by Norwood and Cater -- and challenged here by Plaintiff -- were undertaken pursuant to their official duties. And, given this broad standard on acting with official discretion, the job-related responsibility of Norwood and Cater to investigate potential criminal behavior, seek arrest

warrants, and make arrests, the court finds that Defendants were acting "pursuant to the performance of [their] duties" and "within the scope of [their] authority" when they took the actions forming the basis for Plaintiff's § 1983 claims. *Sims*, 972 F.2d at 1236.

### 2. Plaintiff Has Not Established a Violation of a Clearly Established Constitutional Right.

Having determined that Defendants Norwood and Cater were operating within the contours of their discretionary authority[8], the court must next ask whether Plaintiff's allegations, if true, are sufficient to overcome Defendants' assertion of qualified immunity. *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). Plaintiff contends that Norwood and Cater violated his constitutional rights by securing his arrest warrants because they lacked probable cause to charge him for failing to register as a sex offender. (Doc. #39 at p. 15 ¶ 1). By demonstrating he was arrested without probable cause, a plaintiff can show a violation of the Fourth Amendment, made applicable to the states by the Fourteenth Amendment. *Brown v. City of Huntsville*, 608 F.3d 724, 734 n. 15 (11th Cir. 2010). To receive qualified immunity, however, an officer need have only arguable probable cause to arrest, not actual probable cause. *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (citing *Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994)); *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) ("To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause."). Arguable probable cause is present when reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed probable cause existed. *Id*. If the arresting officer had arguable probable cause to arrest for any

---

[8] As noted above, Officers Norwood and Cater were acting within their discretionary authority as task force members who were assigned to enforce the state-mandated registration requirements of sex offenders. (Doc. #37-5 at p.5; 37-7 at p. 5; 38 at p. 7 ¶ 20 ).

offense, then qualified immunity applies. *Id*. Thus, the question here is not whether there was probable cause to make an arrest.[9] *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990) (to overcome qualified immunity, a § 1983 plaintiff must do more than establish that the officers lacked probable cause; rather, the key question is whether the officers had "arguable" probable cause).[10] Thus, the court must determine if Norwood and Cater possessed arguable probable cause.

As noted above, an officer is entitled to qualified immunity if "a reasonable officer could have believed" that his challenged conduct was lawful "in light of clearly established law and the information the searching officers possessed." *Creighton*, 483 U.S. at 641. The central question, therefore, is whether someone in the officer's position could reasonably -- but mistakenly -- conclude that his conduct complied with the Fourth Amendment. *Creighton*, 483 U.S. at 641. *See*

---

[9] In *Malley*, the Supreme Court established that even if a magistrate approves an arrest warrant, the officer who applied for the warrant may be liable for violating the Constitution if the evidence presented to the magistrate was insufficient to establish probable cause. 475 U.S. at 345. The Eleventh Circuit has applied *Malley* to hold an officer liable where he secured an arrest warrant based on an affidavit that "articulate[d] neither the basis for h[is] belief that [the suspect] violated the law nor any affirmative allegation that []he had personal knowledge of the circumstances of [the] alleged crime." *Kelly*, 21 F.3d at 1555; *see also Garmon v. Lumpkin Cnty.*, 878 F.2d 1406, 1408-09 (11th Cir. 1989) (holding an officer liable where the affidavit states only that the suspect "did ... commit the offense" because without "information providing the basis for the affiant's belief nor any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime," the "conclusory assertion clearly is insufficient to establish probable cause" (citations omitted)). However, and to be clear, *Malley* should not be read to subject officers to liability simply for leaving evidence out of an affidavit. Instead, *Malley* sets a standard by which to judge the overall sufficiency of an officer's evidentiary basis for seeking an arrest warrant. The *Malley* decision explicitly states that the officer commits a violation only if his affidavit lacked probable cause and he "should not have applied for the warrant." 475 U.S. at 345. Inherent in this language is the principle that qualified immunity is not lost when all the evidence available to the officer establishes at least arguable probable cause, even if this evidence is not listed in an affidavit. *See Joyce*, 2007 WL 2781196, at *6.

[10] Consistent with *Malley*, the Eleventh Circuit also requires an even less stringent standard than probable cause in the qualified immunity arena. An officer is required only to have had "arguable probable cause" to benefit from qualified immunity. *See Knight v. Jacobson*, 300 F.3d 1272, 1274 (11th Cir. 2002); *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) ("to enjoy qualified immunity [the officer] need only have had arguable probable cause"); *Pickens v. Hollowell*, 59 F.3d 1203, 1206 (11th Cir. 1995) ("the appropriate inquiry for qualified immunity is . . . whether there was arguable probable cause").

15

*also Saucier v. Katz*, 533 U.S. 194, 206 (2001);[11] *Hunter*, 502 U.S. at 227; *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). Accordingly, in order to defeat an officer's qualified immunity defense, Plaintiff must show that "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Malley*, 475 U.S. at 345.

The defense of qualified immunity allows police officers a wider berth when reasonable mistakes have been made while making arrests. *See, e.g., Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) ("The probable cause standard inherently allows room for reasonable mistakes by a reasonable person, but the qualified immunity standard affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Hunter*, 502 U.S. at 229)); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (holding that a police officer was entitled to qualified immunity where he had "arguable probable cause" in executing an arrest warrant). In *Ulrich*, two officers arrested the plaintiff for violating a harassment restraining order, even though they admitted to plaintiff, at the time of the arrest, that his assertion that he had not violated the order was "technically correct." 715 F.3d at 1057. The key point behind the Eighth Circuit's affirmance of a finding of qualified immunity was its recognition that "arguable probable cause depends on the viewpoint of an objectively reasonable officer, not the view point of the particular arresting officer." *Id*. at 1060 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). In addition, an important aspect of the Eighth Circuit's ruling revolved around officers being required to interpret the current status of Minnesota domestic relations law. *Id*. at 1060.

---

[11] *Saucier* has been overruled in part. Its rigid adherence to a two-step process for examining qualified immunity claims has given way to a more flexible approach. *Pearson*, 129 S. Ct. at 818. *See also Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 409 (5th Cir. 2009) ("*Saucier's* rigid 'order of battle'... is now advisory.").

Similar to the facts in *Ulrich*, there is a factor in this case that supports the application of qualified immunity. Not only were Norwood and Cater called upon to interpret Alabama law, the DA's office approved the applications that Norwood and Cater submitted in support of the arrest warrants. Under the totality of the circumstances, Norwood and Cater reasonably relied on the DA's erroneous probable cause determination, and that is what actually resulted in Bell's arrests. *See Messerschmidt*, 132 S. Ct. at 1244, 1249 ("[T]he fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." (citing *Malley*, 475 U.S. at 341)). *See e.g.*, *Capone v. Marinelli*, 868 F.2d 102, 105-06 (3d Cir. 1989) (granting a law enforcement officer qualified immunity in a § 1983 lawsuit where he reasonably relied on a facially valid arrest warrant). Here, although Norwood and Cater were mistaken in applying for the arrest warrants, Bell would never have been arrested if the DA's office had not (erroneously) approved the applications for warrants. Thus, notwithstanding Norwood and Cater's mistaken understanding of Defendant's notification and registration requirements, no arrest warrants would have issued if the DA's office had reached a correct determination that Bell was not required to register a new address if he moved within Jefferson County.

Plaintiff's argument that Norwood and Cater's mistakes make them individually liable under § 1983 fails for a second reason. The protections afforded by qualified immunity apply regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks omitted). *See also Hunter*, 502 U.S. at 227 ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to [qualified]

17

immunity." (quoting *Creighton*, 483 U.S. at 641)).  It is not enough to show a mistake — a § 1983 plaintiff must also show that his clearly established constitutional rights were violated (*i.e.*, that a reasonable police officer would have known that he was violating those rights at the time of the challenged decision).

The court readily concludes that qualified immunity applies here because Norwood and Cater had *arguable* probable cause to arrest Bell, even though the officers were mistaken with respect to the reports and affidavits they prepared related to Plaintiff — they did not have actual probable cause. But that is not the question.  Indeed, in the vast majority of cases which involve a qualified immunity defense, a court would not be required to evaluate issues related to qualified immunity if the public official had not made some mistake.  An officer might make a mistake for several reasons. For example, he may be unaware of existing law and how it should be applied. *See, e.g., Saucier*, 533 U.S. at 208. Alternatively, he may misunderstand important facts about the search and assess the legality of his conduct based on that misunderstanding. *See, e.g., Arizona v. Evans*, 514 U.S. 1, 15-16 (1995). Finally, an officer may misunderstand elements of both the facts and the law. *See, e.g., Creighton*, 483 U.S. at 641. Qualified immunity is available to a police officer regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231; *see also Butz*, 438 U.S. at 507 (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

The key question is whether Norwood and Cater's mistakes were unreasonable in light of the present circumstances and information.  The court concludes they were not.

## V.     CONCLUSION

Norwood and Cater have carried their burden on summary judgment of demonstrating that there are no material facts in dispute and that they are entitled to judgment as a matter of law on Plaintiff's federal claims.  More specifically, Norwood and Cater are entitled to qualified immunity with respect to Plaintiff's federal claims because their actions did not violate any clearly established law. Norwood and Cater properly asserted the defense of qualified immunity and demonstrated that Bell's arrests were within the scope of their discretionary authority to enforce the registration requirements of sex offenders under Alabama law. Although Norwood and Cater were mistaken in their belief that there was probable cause for Bell's arrests, Bell has failed to establish that Norwood and Cater did not have *arguable* probable cause.  This is particularly the case because, here, the police officers sought the DA's approval for any arrest warrants. Qualified immunity allows a wide berth for reasonable errors made by reasonable law enforcement officials where *arguable* probable cause existed. Therefore, qualified immunity protects Norwood and Cater for their reasonable mistakes of law and fact.

A separate order in accordance with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this August 28, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE